## SOUTHERN RAILWAY COMPANY *v.* DAVIS.

*Simmons, C. J.*—1. There being sufficient evidence to support a finding that the injury complained of was caused by the defendant's negligence, there was no error in overruling the *certiorari,* which presented for review by the superior court the single question whether or not the verdict in the magistrate's court was contrary to law and the evidence.

2. The alleged error in admitting evidence could not be considered by the superior court, for the reason that the petition for *certiorari* did not state what, if any, objection was made when the evidence in question was offered.        *Judgment affirmed.*

October 26, 1896.  Argued at the last term.

*Certiorari.*  Before Judge Milner.  Whitfield superior court.  October term, 1895.

Davis sued the railway company on account of the loss of three hogs, and obtained a verdict which was sustained on *certiorari.* It appears, that on November 22, 1894, plaintiff shipped a car-load of hogs from Philadelphia, Tenn., to Dalton, Ga., under a special contract containing the following among other agreements by the shipper:  In

consideration of transporting the stock at a reduced rate and furnishing to the owner or his agent free transportation on the train with the stock, "I agree that said . . . railway company is only bound to carry said live stock to its freight station at Dalton and there have the same ready to be delivered and unloaded by the consignee or upon his order, and . . . shall not be held liable for any loss, injury, damage or depreciation which the animals or either of them suffer in consequence of either of them being weak, or escaping, or injuring themselves or each other, or in consequence of overloading, heat, suffocation, fright, viciousness; . . and I expressly release said . . railway . . from all other damages incidental to the railroad or water transportation of said stock, which shall not be established by positive evidence to have been caused by the negligence of some officer or agent of said . . railway. . . And I further agree that I will load and unload or transfer said stock at my own risk and expense; and that in the event of accidents and delays from any cause whatever, I will at my own expense feed, water and take care of said stock, or cause the same to be done for me. . ."

Plaintiff testified: I superintended the loading of the hogs. The car was in good condition, and the hogs were well and properly loaded and not overcrowded. The car left Philadelphia between 9 and 10 o'clock in the morning. I did not accompany them to Cleveland, but came to Cleveland on a passenger train that passed Philadelphia in the evening, and reached Cleveland between 7 and 8 o'clock at night. From there to Dalton I came on the train with the hogs. It is 30 miles from Dalton to Cleveland, and 75 miles from Dalton to Philadelphia. When I arrived at Cleveland I found the hogs in the car on a side-track. I went to the agent there to know why they had not gone forward and when they would go. He told me that it was impossible for them to go until he could make up a train.

I waited around the depot until the train was made up. The train left Cleveland between 11 and 12 o'clock, and reached Dalton between 4 and 5 o'clock, or about daylight. The hogs could have been brought by way of Ooltewah, without stopping them in Cleveland, and got here before night. The conductor in charge of the train tried to get me to relieve him from placing the car in Dalton where it could be unloaded, claiming that he was behind time. I told him that I wanted him to place the car, as I expected my hands to be there to unload it when it arrived in Dalton. When the train arrived there I got off and went immediately home. I did not go and show the conductor where to leave the car. It was placed on the side-track next to the stock-pen, but lacked about half a car-length of being placed opposite the chute of the pen, so the hogs could be unloaded. After staying at home between a half and three quarters of an hour, I got the hands and went to the pen to unload the hogs; got some pinchbars and shoved the car up opposite the chute. This took over an hour. When we got the hogs unloaded two of them were dead and one other died shortly after we got it out of the car (giving their weight and value). When I arrived at Cleveland it was dark. I examined the car the best I could, by striking matches and looking into it; did not use a lantern. No accident happened to the train, but we waited a while after reaching Cohutta for a train from Chattanooga, which brought the hogs on to Dalton. The train from Cleveland to Cohutta stopped at Cohutta. While the car was at Cleveland I did not ask for the hogs to be unloaded. I have had a great deal of experience in shipping hogs; have been in the business eighteen years. A freight-train, if not delayed, ought to cover the distance from Philadelphia to Dalton in about five hours. These were large fat hogs, and in my opinion the delay at Cleveland caused them to smother. Such hogs are more likely

to smother while standing still than while the train is in motion.

Defendant introduced a yard clerk at Cleveland, who testified that "our records show" that the car in question reached Cleveland from Philadelphia at 4:30 p. m. There is a stock-pen at Cleveland, for the purpose of unloading and watering and feeding stock. The car left on the first train that left Cleveland for Dalton.

*Maddox & Starr*, for plaintiff in error.
*R. J. & J. McCamy*, contra.